THIRD DIVISION
SEPTEMBER 10, 2008

No. 1-06-0957

| | | |
|---|---|---|
| THOMAS L. KNIGHT, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 00 L 4988 |
| | ) | |
| CHICAGO TRIBUNE COMPANY, a Corporation, | ) | |
| MAURICE POSSLEY and KEN ARMSTRONG, | ) | Honorable Robert E. Gordon, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

This defamation action involves a trial about a trial about a trial. Thomas Knight was an assistant State's Attorney who prosecuted Rolando Cruz for the murder of Jeanine Nicarico. Eventually the court acquitted Cruz. Other prosecutors later charged Knight with obstruction of justice. Knight also won an acquittal. Knight then sued Maurice Possley and his employer, the Chicago Tribune, accusing them of publishing falsehoods in their article about the prosecution against Knight on the charge of obstructing justice. The jurors found factual inaccuracies in the article. However, in response to a special interrogatory, they found that Knight failed to prove, by clear and convincing evidence, that Possley acted with actual malice. The trial court entered judgment in favor of defendants based on the general verdict supported by the special finding.

1-06-0957

On appeal Knight argues that the court instructed the jury erroneously on damages and erroneously admitted evidence of other negative publicity about Knight. Knight also contends that defense counsel's closing remarks deprived him of a fair trial. We find that the court's rulings, sustaining objections to the remarks at issue, cured any such error. Any errors in the admission of evidence on damages and the damages instructions had no effect on the dispositive finding that Knight failed to prove actual malice. Accordingly, we affirm the judgment entered in favor of defendants.

## I. BACKGROUND

On February 25, 1983, police detectives in DuPage County went to the home of Tom and Pat Nicarico in response to a report that the Nicaricos could not find their daughter, Jeanine. The detectives saw that someone had kicked the front door open, and that person kicked hard enough to leave an impression of his boot. Two days later, Jeanine was found dead from several severe blows to the head.

An anonymous tip led police to question Alejandro Hernandez in March 1983. Police later charged Hernandez, Steven Buckley and Rolando Cruz with the murder. Thomas Knight led the prosecution. A jury found Cruz and Hernandez guilty of murder. Our supreme court reversed the convictions and remanded for retrial. During a subsequent trial an officer admitted that he had lied in the prior trial about the evidence against Cruz. The judge acquitted Cruz.

A number of journalists published stories about the events leading to the prosecution and eventual acquittal of Cruz. Investigators began to look into the conduct of the police officers and attorneys who constructed the case against Cruz. Some of the investigators, including Steven

-2-

Kirby, spoke to a grand jury about their findings. Kirby told the grand jury that he interviewed John Gorajczyk, who worked in the DuPage County crime lab in 1983. Gorajczyk compared Buckley's boots to the imprint on the Nicaricos' front door. He concluded that Buckley's boots did not make the imprint. Gorajczyk told the sheriff his findings. The next day the boots were not in the crime lab. Gorajczyk never wrote a report of his findings. Other experts subsequently compared Buckley's boots to the imprint and found a match.

During preparation for the trial of Cruz, Hernandez and Buckley, Knight learned of Gorajczyk's initial examination and asked Gorajczyk why he had not written a report. Gorajczyk told Knight he did not write a report because he had completed only a cursory examination, without any notes, before the boots left the crime lab. According to the transcript of Kirby's testimony to the grand jury, Kirby affirmed that "Knight's response was to tell Gorajczyk not to discuss the matter with any one [*sic*] and not to report to anyone about his negative findings and his failure to write a report."

The grand jury indicted four police officers and three prosecutors, including Knight, for perjury and obstruction of justice in connection with their handling of the charges against Cruz, Hernandez and Buckley. Some newspapers referred to the four officers and three attorneys collectively as the DuPage 7.

Before the DuPage 7 trial began, Knight's attorney obtained in discovery transcripts of the grand jury proceedings which led to the indictments against the DuPage 7. Knight's attorney decided to send the complete transcripts, including the testimonies of all witnesses, to Ted Gregory, a reporter for the Chicago Tribune.

1-06-0957

On January 12, 1999, the Tribune published an article entitled "Prosecution on trial in DuPage," by Maurice Possley and Ken Armstrong. The article appeared in a series entitled "Trial & Error: How Prosecutors Sacrifice Justice to Win." The reporters documented the incidents that led up to the indictments of the officers and prosecutors. In the article they stated:

"At its core, the indictment of the DuPage 7 focuses on two key aspects of the case: that on the eve of the first trial of Cruz *** [two detectives] concocted a lie--that Cruz had told them of having a 'vision' of the crime that included details only the killer would know. That lie, according to the indictment, was endorsed and perpetuated by the prosecutors. In addition, prosecutors King and Kilander are accused of concealing notes that showed there was an admitted killer named Brian Dugan, a man who had already pleaded guilty to two other murders, including the killing of a 7-year-old girl.

* * *

*** [Cruz] is expected to testify that what he told the officers and prosecutors during the initial days of the investigation--words that ultimately would become the basis for a case against him--was something he made up in hopes of cashing in on a $10,000 reward.

* * *

In the weeks following the discovery of Jeanine's body, Hernandez *** told detectives *** that three people committed the crime, including Buckley and someone named 'Ricky.'

-4-

While the detectives never found anybody named 'Ricky,' they picked up Buckley, who turned over a pair of his boots for comparison with the print on the front door. But Buckley denied any involvement in the crime.

Eager to capitalize on the reward, Hernandez and Cruz babbled incessantly to the detectives and the grand jury investigating Jeanine's murder. ***

* * *

As the trial approached, lead prosecutor Thomas Knight summoned John Gorajczyk, a shoe print examiner in the sheriff's police crime lab, to discuss his examination of Buckley's boots, according to the grand jury transcripts.

Earlier, Gorajczyk had compared Buckley's boots to the print on the Nicarico door and concluded they didn't match. He did not write any report about his findings. Gorajczyk told the DuPage grand jury that Knight told him to keep his mouth shut about his conclusion and not to tell anyone that there was no written report.

Knight then sent the print and boots to the Illinois State Police crime lab, where an examiner said he could not conclusively say if the boot matched or not. ***

Eventually, Knight settled on Louise Robbins, *** who not only said Buckley's boots matched the door print, but that she could look at a shoe print and tell the height and race of the wearer. ***

The FBI lab later conducted its own tests and concluded that Buckley's

boot did not match the print on the door." Maurice Possley & Ken Armstrong, *Prosecution on trial in DuPage*, Chicago Tribune, Jan. 12, 1999, at 1.

The trial court rescheduled Knight's trial, from January 19, 1999, to March 9, 1999, on the charge of obstructing justice. The trial ended in acquittal for Knight.

In May 2000 Knight sued Possley, Armstrong and the Tribune for defamation. Knight's suit focused on defendants' false report that Gorajczyk testified that Knight told Gorajczyk to "keep his mouth shut about his conclusion" that Buckley's boot did not dent the Nicaricos' front door. Knight claimed that the false statement implied that he had obstructed justice. The trial court found that Knight stated a cause of action for defamation *per se*. Therefore, the trier of fact could presume that Knight suffered damages. See Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 87 (1996). However, as Knight admitted, the case presented an "evidentiary dispute about the appropriate amount of damages."

Knight moved to block evidence of radio and television programs, along with newspaper articles, that commented on the prosecution of Cruz. The trial court granted the motion in part, but permitted defendants to use a few stories relating directly to the boot experts.

At trial, Possley admitted that he knew Gorajczyk never testified before the grand jury that indicted Knight. Only Kirby testified to the grand jury about Gorajczyk's findings. In an early draft of the article, Possley wrote that "Gorajczyk recalled later" that Knight directed him not to discuss his findings. An editor thought the sentence vague. Possley suggested changing the passage by adding, "according to the grand jury transcript." The editor rejected that suggestion because the prior paragraph included that phrase. The editor asked, "Can we just say

'Gorajczyk told the grand jury?'" Possley said, "Sure." At trial Possley explained that at the time of the editing, months after he first read the transcripts and under the pressure of a looming deadline for printing the article, he forgot that Kirby, not Gorajczyk, testified to the grand jury about the encounter.

Possley defended his statement that Knight told Gorajczyk to "keep his mouth shut." Possley claimed that his article accurately paraphrased Kirby's testimony that Knight told Gorajczyk "not to discuss the matter with any one [*sic*] and not to report to anyone about his negative findings." Possley admitted that he relied solely on the grand jury transcripts for that part of the story; he did not attempt to contact Gorajczyk to verify the facts as Kirby related them.

Gorajczyk testified that prior to the first trial of Cruz, Buckley and Hernandez, Buckley's attorney learned of the initial comparison of the boot with the door. The attorney subpoenaed Gorajczyk. Knight then contacted Gorajczyk to ask about the initial comparison. Gorajczyk described his examination and explained his decision not to write a report of the examination. Gorajczyk testified that Knight asked him "not to discuss this with anyone until [Gorajczyk] contacted [Knight] and *** notified [Knight] that [Gorajczyk] was speaking with that person." Knight did not tell Gorajczyk to keep his mouth shut. Knight's request for notice "was the usual procedure from all the attorneys" whenever someone contacted an employee of the crime lab. According to Gorajczyk, Kirby, in his testimony to the grand jury, reported their discussion inaccurately.

Knight admitted that he received a fair trial, as a member of the DuPage 7, on the charge of obstructing justice. He also admitted that the Tribune generally printed fair and accurate

reports of the trial, even when it printed the reports Possley wrote.

The court permitted defendants to present to the jury a few publications concerning the conviction of Cruz. A segment of "American Justice" included the following report:

"Thomas Knight known as the black knight for his hard charging style prosecuted the case. *** [J]ust days before trial the prosecution suddenly announced that Cruz had made a statement tantamount to a confession a year and a half earlier.

Two Du Page County detectives claimed that on May 9th, 1983, Cruz had told them about a dream he had had. *** [T]he dream revealed details nearly identical to the Nicarico murder ***. Cruz denied ever making the so-called 'vision statement.'

***

*** [T]he detectives did not tape record the alleged statement, did not take any notes, and did not even file a report; nor did they follow up on this key piece of evidence the very next day when they were taping an interview with Cruz.

* * *

*** The case against Ste[v]en Buckley hinged on the boots he had handed over so willingly to police. The prosecution paid $1,000 a day to a forensic anthropologist who testified that Buckley and only Buckley could have kicked in the front door of the Nicarico home.

***

*** One month before trial [the] Defense Attorney [for Buckley] got a tip that a prior expert who examined Buckley's boots *** had ruled them out as a match. The sheriffs had actually retrieved the boots and instructed the [expert] not to file a report. A move that led the crime lab director to resign. Prosecutors never told the defense about that initial finding, a violation of Illinois law."

*American Justice* (A&E television broadcast).

An article published in the Los Angeles Times in 1992 emphasized different aspects of the story:

"Ramon Mares came along. He and Cruz had been drinking *** late one night in March, Mares told [a] Detective ***. Cruz had turned emotional, had started sobbing. I know who killed the little girl in Naperville, Cruz had said. I know who did it. I was there. ***

Years later, Mares would insist that Cruz hadn't really said, 'I was there.' Years later, Mares would testify that the DuPage prosecutors had pressured him into saying those words because that's what they wanted to hear. Years later, he would explain that he'd lied *** because he was interested in the reward money.

To DuPage County Assistant State's Attorney Thomas Knight in the late spring of 1983, however, Mares was the clincher. Highly regarded as a ferociously effective prosecutor, Knight had grown close to the Nicarico family and determined to find their daughter's killer. He had done so, he now decided. Cruz, Hernandez and Buckley, out to do a burglary, had unexpectedly found a

little girl at home.  Jeanine could identify them, so they had killed her.  \*\*\*
Knight was positive.

\* \* \*

And yes, they had tied Ste[v]en Buckley's boot print to the murder, but only after they'd shopped the print to three different experts before finding one- Louise Robbins, a North Carolina anthropologist with self-described 'forensic' talents- willing to say the print on the Nicarico door was definitely Buckley's.  \*\*\* 'Louise Robbins arrives.  This is the boot, she says.  That'll be $10,000.  So now we have evidence.'" Barry Siegel, *Presumed Guilty: An Illinois Murder Case Became a Test of Conscience Inside the System*, Los Angeles Times, Nov. 1, 1992, at 18.

When Knight rested in rebuttal, the court entered judgment in favor of Armstrong due to the lack of evidence tying Armstrong to the alleged defamation.

In closing defense counsel argued:

"This 29-word needle is buried in a 5,000-word article and a 20,000-word series which was part of a massive media haystack of negative publicity about Mr. Knight, and the needle didn't cause him any damage.

\*\*\* I'm going to go into \*\*\* Mr. Knight's reputation.  \*\*\* Either he negligently or knowingly prosecuted three innocent boys --

MR. KNIGHT:  Judge, I will object.

THE COURT:  Okay.  Your objection is sustained \*\*\*.

\* \* \*

\*\*\* Innocent people went to prison, some to Death Row.

\*\*\* It is important award-winning journalism and is shedding light on our societal problems so that people like Steve Buckley don't have to spend three years in prison when they are innocent.

MR. KNIGHT: Object, your Honor. \*\*\*

THE COURT:  Objection sustained."

Knight asked the court to instruct the jury:

"The Court has found that the statement published by the defendants which is at issue in this case was defamatory per se, so that is not an issue you will need to decide. \*\*\*.

\*\*\*

If you decide for the plaintiff on the question of liability, you must fix the amount of money which will reasonably and fairly compensate him for the following elements of damages:

Past and future injury to professional and personal reputation;

Past and future humiliation \*\*\*; and

Past and future loss of income and business opportunity."

The court refused both instructions.  Instead, the court instructed the jury:

"The plaintiff has the burden of proving each of the following propositions: First, that the complained of statement was false in a material way.

Second, that the defendants published the complained of statement with actual malice and that they either knew that the statement was false or published it with a reckless disregard of whether the statement was true or not.

Third, that as a result of the complained of statement, the plaintiff sustained actual and/or presumed damages.

\* \* \*

In order for you to find that the defendants published the complained of statement with actual malice, the plaintiff must prove by clear and convincing evidence that the defendants either knew that the complained of statement was false in a material way at the time of publication or that the defendants had a reckless disregard of whether it was true or false. \*\*\*

\* \* \*

If you decide for the plaintiff on the question of liability, you must fix the amount of money which will reasonably and fairly compensate him for the following elements of damages proved by the evidence or presumed to have resulted from the defamation complained of statement.

First, the impairment of plaintiff's personal and professional reputation and standing in the community.

Second, the personal humiliation and anguish and suffering.

Third, the value of loss of income and business opportunities.

\*\*\*

Defamation per se is considered so obviously damaging that damages are presumed.

*** However, the presumption may be overcome or limited by evidence."

The court also asked the jury to answer the following special interrogatories:

"Do you find by clear and convincing evidence that the complained of statement was published with actual malice by the Chicago Tribune Company and Maurice Possley?

* * *

*** Do you find that the following complained of statement was defamatory of Thomas Knight?  'Gorajczyk told the DuPage grand jury that Knight told him to keep his mouth shut about his conclusion and not to tell anyone that there was no written report.'"

The jury returned a verdict in favor of defendants.  The jury found, by special verdict, that defendants did not defame Knight.  Further, Knight failed to prove that defendants acted with actual malice.

In his motion for a new trial, Knight argued that the trial court erred in admitting evidence of prior negative publicity and in rejecting Knight's proposed instructions on damages.  The trial court defended its damages instructions and the decision to permit evidence of prior negative publicity as mitigating Knight's claimed damages.  The court also held that the alleged errors had no effect on the result because the jury, by special interrogatory, found no actual malice, and therefore the jury had no reason to consider the question of damages.  The court denied the

motion for a new trial.  Knight now appeals.

## II.  ANALYSIS

Again, on appeal, Knight argues that the court committed reversible error when it admitted evidence of prior negative publicity regarding the prosecution of Cruz.  We will not reverse a jury verdict because of error in an evidentiary ruling unless the trial court abused its discretion and the ruling prejudiced the appellant.  Taluzek v. Illinois Central Gulf R.R. Co., 255 Ill. App. 3d 72, 83 (1993).  The appellant bears the burden of establishing prejudice.  Smith v. Baker's Feed & Grain, Inc., 213 Ill. App. 3d 950, 952 (1991).

Knight claims that the court's evidentiary ruling here conflicts with Myers v. The Telegraph, 332 Ill. App. 3d 917, 924-25 (2002).  The court in Myers rejected the "incremental-harm doctrine," which "bars recovery for any false and defamatory statements whose potential damaging effect is outweighed, as a matter of law, by other harmful, but true, text in the same publication."  Myers, 332 Ill. App. 3d at 924.  Knight reads Myers as authority for barring any evidence of the plaintiff's reputation, whenever the plaintiff has stated a cause of action for defamation *per se*.  In effect, he argues that the law entitles every such plaintiff to an irrebuttable presumption of damages.  We do not believe the holding of Myers reaches so far.  Creating such an irrebuttable presumption, and disallowing all evidence of the plaintiff's reputation, would set Illinois law far from the law of other jurisdictions, as most states permit defendants to present, in mitigation of damages, evidence of the plaintiff's reputation before the alleged defamation.  See, e.g., Martin v. Roy, 54 Mass. App. Ct. 642, 646, 767 N.E.2d 603, 607 (2002); Gosden v. Louis, 116 Ohio App. 3d 195, 215-16, 687 N.E.2d 481, 494 (1996); McBride v. New Braunfels Herald-

Zeitung, 894 S.W.2d 6, 9 (Tex. App. 1994); Williams v. District Court, Second Judicial District, City & County of Denver, 866 P.2d 908, 911-12 (Colo. 1993); Guccione v. Hustler Magazine, Inc., 800 F.2d 298, 303-04 (2d Cir. 1986); Marcone v. Penthouse International Magazine for Men, 754 F.2d 1072, 1079 (3d Cir. 1985); Gobin v. Globe Publishing Co., 229 Kan. 1, 5-6, 620 P.2d 1163, 1166-67 (1980).

However, we need not address the reach of the holding in Myers. The jury here found, by special verdict, that Knight failed to prove actual malice by clear and convincing evidence. That finding alone, apart from any finding on damages, mandated a judgment in favor of defendants. See Wanless v. Rothballer, 115 Ill. 2d 158, 171-75 (1986). The negative publicity evidence had no bearing on the issue of actual malice.

Knight maintains that the negative publicity evidence so thoroughly prejudiced him that the jury could not weigh the evidence of malice impartially. Possley, a veteran reporter, knew that he read only the grand jury transcript of Kirby's testimony. Possley never contacted Gorajczyk to verify the report of what Knight said to Gorajczyk. Possley never asked Knight about what Knight said to Gorajczyk. Possley rephrased Kirby's testimony that Knight said "not to discuss" the matter, and wrote instead that Knight told Gorajczyk to "keep his mouth shut."

In opposition to this evidence, defendants offered only the testimony of Possley and other editors about the discussion that led to the introduction into Possley's draft of the phrase, "Gorajczyk told the grand jury." Possley testified that when he accepted the change he simply forgot that he had read Kirby's testimony and Gorajczyk had not spoken to the grand jury. Possley defended his use of the phrase "keep his mouth shut" as an accurate paraphrase of Kirby's

testimony. Possley and all the editors testified that when they published the article they believed in the truth of every assertion therein. They did not entertain any serious doubts about any of the statements in the article.

As authority for reversal here Knight cites White v. Garlock Sealing Technologies, LLC, 373 Ill. App. 3d 309 (2007). In that case the jury returned a general verdict for the defendant, supported by a special verdict that the defendant's products did not proximately cause the plaintiff's decedent to contract asbestosis. The jury also found, by special verdict, that asbestosis proximately caused the death. In a posttrial motion the plaintiff argued that the testimony of the defendant's expert violated discovery rules. The expert testified at trial that the decedent did not have asbestosis at all. That testimony directly conflicted with the expert's deposition testimony. The trial court found that the undisclosed opinion prejudiced the plaintiff, despite the special verdict in which the jury apparently rejected the expert's testimony, as the jury found that the decedent had asbestosis, and that disease caused his death. The trial court granted the plaintiff a new trial.

    The appellate court affirmed the award of a new trial. The appellate court explained:
"[W]e agree with the trial court's determination that [the] new opinions *** were
so potentially prejudicial that granting *** a new trial was entirely appropriate.
When, as here, a jury has heard improper evidence, a trial court always possesses
the authority to award a new trial to the injured party, no matter what special
findings the jury may have made. The trial court is in the best position to
determine to what extent the improper evidence may have affected the decisions

of the jury, including any special findings." White, 373 Ill. App. 3d at 328-29.

Here the trial court found that any error did not affect the special verdict. While the negative publicity here might have affected Knight's credibility, it apparently would not affect the credibility of Possley and the editors. Knight's testimony had no bearing on the issue of actual malice, which turned primarily on the credibility of Possley and the editors. We defer to the trial court's finding, from its superior perspective, that any evidentiary error relating to the negative publicity made no difference to the result of the trial. Because Knight has not met his burden of proving prejudice, we will not reverse the judgment on the basis of the evidence of negative publicity.

Knight contends that defense counsel's comments in closing argument require reversal. Defense counsel pointed out that the prosecution of Cruz, Hernandez and Buckley kept those men, innocent of the charges against them, in prison for years. The trial court promptly sustained Knight's objections to those comments. Usually the trial court can cure any potential error by promptly sustaining appropriate objections. See Simmons v. Garces, 198 Ill. 2d 541, 567 (2002). Moreover, as the comments did not concern the issue of actual malice, we see no reason to believe that they affected the result of the trial. See Simmons, 198 Ill. 2d at 566-67. Again, we find no reversible error.

The refused instructions provide grounds for Knight's third argument for reversal. The trial court has discretion to decide on jury instructions. Dillon v. Evanston Hospital, 199 Ill. 2d 483, 505 (2002). The court abuses its discretion if it gives unclear or misleading instructions or if the instructions do not fairly and correctly state the law. Dillon, 199 Ill. 2d at 507. We will not

reverse the judgment based on erroneous instructions unless the error prejudiced the appellant. Schultz v. Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 274 (2002).

Knight offered an instruction that would have informed the jury that the judge found defendants guilty of defamation *per se*. The judge refused the instruction because he had held only that Knight stated a cause of action for defamation *per se*. The judge had not usurped the jury's function of deciding whether the words had defamatory effect. See Chapski v. Copley Press, 92 Ill. 2d 344, 352 (1982). The judge also refused the instruction Knight offered on past and future damages.

The challenged instructions do not relate to the finding that Knight failed to show actual malice. Because Knight's proposed instructions would not alter the dispositive finding of no malice, the alleged instructional error cannot justify reversal here. See Beiermann v. Edwards, 193 Ill. App. 3d 968, 981 (1990).

Finally, Knight suggests that the law should change to permit him to prevail without clear and convincing evidence of actual malice. He acknowledges that the standards enunciated in New York Times Co. v. Sullivan, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), still bind this court. We continue to adhere to binding precedent. Knight has preserved the issue for further review.

All of the alleged errors Knight found had no bearing on the issue of actual malice. The jury found by special interrogatory that Knight failed to prove, by clear and convincing evidence, that Possley acted with actual malice. That finding demands judgment in favor of defendants. Because the alleged errors did not affect the dispositive finding, we affirm the judgment of the

1-06-0957

trial court.

       Affirmed.

       NEVILLE, and CAMPBELL, JJ., concur.

1-06-0957

| Please Use Following Form: | |
| --- | --- |
| Complete TITLE of Case | THOMAS KNIGHT,<br><br>                              Plaintiff-Appellant,<br><br>v.<br><br>CHICAGO TRIBUNE COMPANY, a corporation, MAURICE POSSLEY and KEN ARMSTRONG,<br><br>                              Defendants-Appellees. |
| Docket No. | |
| COURT<br><br>Opinion Filed<br><br>JUSTICES | Nos. 1-06-0957<br>Appellate Court of Illinois<br>First District, THIRD Division<br><br>September 10 , 2008<br>(Give month, day and year) |
| | PRESIDING JUSTICE MURPHY delivered the opinion of the court:<br><br>Neville and Campbell, JJ.,                                        concur [s]<br><br>                                                                    dissent[s] |
| APPEAL from the Circuit Ct. of Cook County, Chancery Div. | Lower Court and Trial Judge(s) in form indicated in the margin:<br><br>The Honorable      Robert E. Gordon,                    , Judge Presiding. |
| | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel) | Attorney for **Plaintiff-Appellant**:      William L. Bowers<br>4170 N. Marine Drive<br>Chicago, IL  60613<br>Phone:  (773) 525-2192 |
| Also add attorneys for third-party appellants or appellees. | Attorneys for **Defendants-Appellees:**      H. Patrick Morris, David M. Macksey<br>Johnson & Bell, Ltd.<br>33 W. Monroe St., Suite 2700<br>Chicago, IL  60603<br>Phone:  (312) 372-0770<br>              -and-<br>Charles L. Babcock, Nancy W. Hamilton<br>Jackson Walker LLP<br>1401 McKinney, Suite 1900<br>Houston, TX  77010<br>Phone:  (713) 752-4200 |

-20-